IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| WOODBRIDGE GROUP OF COMPANIES, LLC, | : | Case No. 17-12560 (KJC) |
| *et al.*[1] | : | |
| Debtors. | : | |
| | : | |
| LISE DE LA ROCHELLE, *et al.* | : | Adv. No. 18-50371 (KJC) |
| | : | (Re: D.I. 15) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| WOODBRIDGE GROUP OF COMPANIES, LLC, | : | |
| Defendants. | : | |

**OPINION**[2]

The Plaintiffs[3] in this adversary proceeding filed their First Amended Complaint (Adv.

D.I. 12) (the "Complaint") on July 17, 2018, asserting four counts against the Debtors:

> (1)   Seeking a declaratory judgment that the Plaintiffs hold pre-petition, valid,
> perfected, first-priority liens against certain real property owned by the
> Debtors; or alternatively,

> (2)   Seeking a declaratory judgment that the Plaintiffs hold pre-petition, valid,
> perfected, first-priority liens against any and all proceeds from the sale

---

[1]  The Woodbridge Group of Companies, LLC and its affiliated companies (the "Debtors") filed chapter 11 petitions in this Court on December 4, 2017, and the Debtors' chapter 11 cases are being jointly administered pursuant to the Order dated December 5, 2017 (D.I. 45), which contains a complete list of the Debtors.

[2]  This Court has jurisdiction to decide the Motion to Dismiss pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (K).

[3]  The plaintiffs in this adversary are: Lise De La Rochelle (a Florida resident), Provident Trust Group, LLC FBO Arnold L. Berman (a California entity), Stephen and Zoila Thompson (Florida residents), Bernard & Sylvia Fineberg Living Trust (a Florida entity), Betty Foster (a Florida resident), Ruth E. Scott (Florida resident), Edna M. Watters (Florida resident), Irene Olin Trust DTD 2/25/1998 (a Florida entity), Kurt Faudel (a Florida resident), C. Spencer & Virginia Van Gulick (Florida residents), Provident Trust Group FBO LLC FBO Nancy E. Kicherer IRA (a California entity), Donald A. and Florence H. Bottaro (Florida residents), Laurence Popolizio (a Florida resident), Michael L. Gross (a Florida resident), Jonathan W. and Barbara Greenleaf, as Trustees of the Greenleaf Family Trust (a California entity).

and/or liquidation of certain real property owned by the Debtors; or alternatively

(3)     Seeking the creation of a constructive trust or equitable lien against certain real property owned the Debtors, or any and all proceeds from the sale or liquidation of that real property, and

(4)     Seeking damages against the Debtors based on financial abuse of elderly individuals under California law.

The Plaintiffs commenced this adversary proceeding by filing a complaint on March 27, 2018. Pursuant to an agreement about deadlines, the Debtors filed a motion to dismiss the original complaint on June 18, 2018.[4] Thereafter, pursuant to an Order approving the parties' stipulation, the Plaintiffs filed the first amended complaint (the "Complaint") on July 17, 2018.[5]

On August 14, 2018, the Debtors filed a Motion to Dismiss the Complaint, with a memorandum of law in support thereof (Adv. D.I. 15, 16) (the "Motion to Dismiss"). The Plaintiffs filed a memorandum of law in opposition to the Motion to Dismiss on September 4, 2018, and the Debtors filed a Reply in support of the Motion to Dismiss on September 18, 2018. The Court heard oral argument on the Motion to Dismiss on September 25, 2018. For the reasons set forth below, the Motion to Dismiss will be granted. Counts I, II and III will be dismissed with prejudice. Count IV also will be dismissed, but with leave to allow Plaintiffs to file motions seeking allowance to file late proofs of claim under Fed. R. Bankr. P. 9006(b) or other applicable law.

---

[4] Adv. D.I.s 6, 7, and 8.
[5] Adv. D.I. 11.

Factual Allegations included in the First Amended Complaint

1.  The Debtors' Organizational Structure and Operations

- Pre-bankruptcy, the Debtors bought, improved, and sold high-end luxury homes, as well as owned and operated full-service real estate brokerages, a private investment company, and real estate lending operations. (¶25).[6]

- The Debtors conducted their business through a network of affiliated companies that own the various assets comprising its businesses. (¶27).

- The Debtors' ultimate parent is RS Protection Trust. (¶28).

- WMF Management, LLC, a debtor in this Court, is a wholly owned subsidiary of RS Protection Trust, that operated the retail fundraising aspect of the Debtors' business and owns seven investment fund entities (the "Funds"). (¶¶ 29-33).

- The Funds' business purpose was to solicit and raise money from members of the general public (including individuals, couples, trusts, and small businesses) to fund the Debtors' real estate and investment operations. The Funds also serviced the debt they raised by collecting loan proceeds from the property owners and paying the noteholders. (¶34-35).

- The Debtors, their affiliates and their representatives specifically targeted elderly individuals as part of their marketing process through advertisements on financial radio programs and retirement seminars. These elderly individuals often became noteholders. (¶56).

- In a typical transaction, a noteholder would loan a fixed amount to a Fund pursuant to a loan agreement for the stated purpose of enabling the Fund to lend money to a third-party borrower. The Fund would contemporaneously enter into a promissory note with the noteholder evidencing the Fund's financial obligation to the noteholder. (¶¶ 36-37).

- The Fund would solicit several noteholders for funds to facilitate the third-party borrower's purchase of a parcel of real property. (¶39).

- The third-party borrower was either a mezzanine holding company ("MezzCo") owned by the Debtors' parent company, or a single property real estate company ("PropCo") owned by a MezzCo. (¶38)

- The MezzCo or PropCo would use money from the Fund to purchase or construct upon a parcel of real property. (¶40).

---

[6] The citations in this section are to paragraphs in the First Amended Complaint (Adv. D.I. 12).

- The loan from the Fund to MezzCo or PropCo would be collateralized by liens against the real property and a pledge of the MezzCo ownership interest in the PropCo. (¶41).

- The loan agreement [between the noteholder - or member of the general public - and the Fund] stated that the noteholder's loan would be secured by a security interest in the Fund's present and future right, title and interest in and to (i) the loan from the Fund to the third-party borrower, (ii) the promissory note evidencing that loan, (iii) the mortgage or deed of trust securing that loan, and (iv) insurance policies in connection with the loan. (¶42).

- In connection therewith, the Fund would execute [in favor of the noteholder]: (i) an assignment of the Fund's right, title and interest in the promissory note reflecting the loan and the related mortgage or deed of trust in connection with the real property, and (ii) a collateral assignment, pursuant to which the Fund assigned to the noteholder the Fund's right, title and interest in the same underlying documents, proceeds and rights thereunder. (¶43)

- Upon information and belief, the original documents evidencing the transactions were not retained by the noteholder, but remained in the Fund or Debtor's possession at all times. (¶44).

- The proceeds from the sale of properties would be disbursed by the applicable PropCo or MezzCo to the Fund, which would in turn use the proceeds to repay lenders [noteholders], among other things. (¶46).

- The Debtors estimate that the Funds, and thereby the Debtors, received approximately $750 million in loans from approximately 9,000 noteholders. (¶47).

- Woodbridge Mortgage Investment Fund 3A ("Fund 3A"), also a debtor before this Court, is the largest Fund. It received over $248 million from approximately 2,822 noteholders. (¶¶ 48–50).

- Fund 3A was in the business of exchanging with members of the public promissory notes collateralized by liens on real properties acquired by a PropCo. (¶51).

2. The Plaintiffs' Loan Agreement and Collateral Assignment with Fund 3A

- The Plaintiffs were solicited by the Funds to invest money and became noteholders with Fund 3A. The Plaintiffs used, among other moneys, retirement funds to make the loans. For some Plaintiffs, the loan amount was their entire retirement fund. (¶¶ 54, 55, 57).

- The Plaintiffs were noteholders with Fund 3A in connection with real property located at 141 South Carolwood Drive, Holmby Hills, California (the "Owlwood Estate" or the "Property"). (¶59).

- Upon information and belief, the Plaintiffs entered into written loan agreements with Fund 3A prior to lending funds to Fund 3A (the "Owlwood Loan Agreements") (¶60).

4

- Pursuant to the Owlwood Loan Agreements, the Plaintiffs lent Fund 3A funds for the stated purpose of funding a secured loan from Fund 3A to a third-party borrower, in this case Sturmer Pippen Investments, LLC ("SPI"). SPI is also a debtor in this Court and, upon information and belief, is the PropCo that owns the Owlwood Estate. (¶¶61-64).

- Under the terms of the Owlwood Loan Agreements, the Plaintiffs were granted "a security interest in all of [Fund 3A's] present and future right, title and interest in and to – (i) that certain loan in the principal amount of $63 million extended to SPI and secured by a first priority lien on the Property (the "Pledged Loan"), (ii) the promissory note evidencing the Pledged Loan, (iii) the mortgage and deed of trust securing the Pledged Loan with an interest on the Property, and (iv) title insurance policies and other instruments or documentation as may be executed and delivered to Woodbridge in conjunction with the Pledged Loan. (¶65).

- The Fund serviced the debt it raised by collecting loan proceeds from the property owners and paying the Plaintiff-noteholders. (¶66).

- Paragraph 2(f) of the Owlwood Loan Agreements states that "Woodbridge retains the right to execute other notes, loan agreements, assignments, and collateral assignments in favor of other lenders as may be necessary to fund the Pledged Loan secured by the Collateral [Property] on a pari passu basis with such other lenders." (¶68).

- Upon information and belief, in exchange for the Owlwood Loans, Fund 3A executed promissory notes (the "Owlwood Lender Notes") in favor of the Plaintiffs evidencing Fund 3A's financial obligation to the Plaintiffs pursuant to the Owlwood Loan Agreements. (¶69).

- Paragraph 14 of the Owlwood Lender Notes provide that the Owlwood Lender Notes were secured by the "Collateral Assignment Documents," defined therein as the "Note, the Loan Agreement of even date herewith between [Fund 3A and the Plaintiffs] . . . and all other instruments executed or to be executed in connection therewith." (¶70).

- Upon information and belief, Fund 3A executed other notes, loan agreements assignments, and collateral assignments as contemplated in the Owlwood Loan Agreements. (¶71).

- Upon information and belief, Fund 3A executed an "Assignment of Promissory Note and Mortgage" and "Collateral Assignment of Note, Mortgage and Other Loan Documents" (collectively, the "Collateral Assignment"). (¶72).

- As stated in the Collateral Assignment, a condition of the Owlwood Loans was that Fund 3A would assign to the Plaintiffs, as additional security for the Owlwood Loan, all of Fund 3A's right, title and interest in and to the Deed of Trust, the promissory note secured by the Deed of Trust, and all rights to receive payments as set forth in the Collateral Assignment. (¶73).

- Upon information and belief, Fund 3A recorded the Collateral Assignment against the Owlwood Estate with the Los Angeles County Registrar-Record/County Clerk. (¶ 80)

- Upon information and belief, Fund 3A represented to the Plaintiffs that recording the Collateral Assignment would grant the Plaintiffs first-position liens on the Owlwood Estate, which was valued higher than the outstanding indebtedness. (¶¶ 77-78).

- Fund 3A was in possession of the original documents and acted as custodian of the records on behalf of the Plaintiffs, in addition to the other noteholders solicited by Fund 3A for the financing of the Owlwood Estate. (¶79).

<u>Motion to Dismiss Standard</u>

Federal Rule of Civil Procedure 12(b)(6), made applicable here by Fed. R. Bankr. P. 7012(b)(6), governs a motion to dismiss for failure to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."[7] When reviewing a motion to dismiss, the court will construe the complaint "in the light most favorable to the plaintiff."[8]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[9] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."[10]

---

[7] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F.Supp.2d 404, 407 (D. Del. 2007).

[8] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)).

[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[10] *Twombly*, 550 U.S. at 555 (citations omitted).

The Court of Appeals for the Third Circuit has outlined a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[11]

The movant carries the burden of demonstrating that dismissal is appropriate.[12] Ultimately, evaluation of a complaint upon a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[13] When deciding a motion to dismiss, a court may generally not consider matters extraneous to the pleadings. However, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."[14]

Discussion

The Debtors argue that the factual allegations in the Complaint, and documents or facts of which this Court may take judicial notice under Fed. R. Evid. 201, demonstrate that the Plaintiffs have failed to state any claims.

1. Do the factual allegations in the Complaint support a claim that the Plaintiffs have a valid, perfected lien on the Property (Owlwood Estate) or in the proceeds from any sale or liquidation of the Property?

The Plaintiffs ask the Court to enter a declaratory judgment that Plaintiffs hold valid, perfected liens against the Property, which is located in Holmby Hills, California, and against the proceeds from any sale or liquidation of the Property. Whether the Plaintiffs are secured creditors

---

[11] *Burtch*, 662 F.3d at 221 (3d Cir. 2011) (citations omitted).
[12] *Intel Corp.*, 496 F.Supp.2d at 408.
[13] *Iqbal*, 556 U.S. at 678.
[14] *Angstadt v. Midd-West School Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (quoting *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)); *see also In re Tropicana Entm't, LLC*, 520 B.R. 455, 467 (Bankr. D. Del. 2014).

turns on whether the Plaintiffs' asserted security interests were perfected as of the commencement of the bankruptcy case.[15]

To perfect a security interest in real property, the putative secured creditor must have a mortgage or deed of trust executed in its favor and duly recorded in the land records as against the real property.[16] The Plaintiffs do not allege that they received - - let alone recorded - - any mortgage or deed of trust from the owner of the Property (SPI).

Instead, the Plaintiffs assert that their perfected liens against the Property and any proceeds thereof arise from the Owlwood Loan Agreements, in which Fund 3A granted the Plaintiffs security interests in Fund 3A's right, title and interest in the loan between Fund 3A and SPI (the "Pledged Loan"). The Plaintiffs assert that Fund 3A executed an "Assignment of Promissory Note and Mortgage" and "Collateral Assignment of Note, Mortgage, and Other Loan Documents" (collectively, the "Collateral Assignment") in their favor.

Under either Delaware or California law, a security interest in an instrument or promissory note may be perfected by filing a UCC-1 statement[17] or by possession.[18] The Debtors have

---

[15] As noted by the Court of Appeals for the Ninth Circuit Court:
> Section 544 of the Bankruptcy Code, the "strong-arm clause," grants a trustee in bankruptcy "the rights and powers of a hypothetical creditor who obtained a judicial lien on all of the property in the estate at the date the petition in bankruptcy was filed." *In re Commercial W. Fin. Corp.,* 761 F.2d 1329, 1331 n. 2 (9th Cir.1985) (citing 11 U.S.C. § 544(a)(1)). "One of these powers is the ability to take priority over or 'avoid' security interests that are unperfected under applicable state law...." *Id.* Avoiding such interests relegates them to the status of a general unsecured claim. *See* 5 *Collier on Bankruptcy* ¶¶ 544.02, 544.05 (Lawrence P. King ed., 15th ed. rev. 2000).

*Neilson v. Chang (In re First T.D. & Inv., Inc.),* 253 F.3d 520, 526 (9th Cir. 2001).

[16] Cal. Civ. Code § 1214. 8 WITKIN SUMMARY OF CAL. LAW, SECURITY TRANSACTIONS IN REAL PROPERTY § 55 (11th ed. 2017) ("[T]he California real property recording system gives priority to the person whose instrument is first recorded, if that person is a bona fide purchaser or encumbrancer without notice of prior interests. Any subsequently recorded mortgage is inferior.").

[17] DEL. CODE ANN. tit. 6, § 9-312(a); Cal. Com. Code § 9312(a). *See* definitions of "instrument" at § 9-102(47) and "promissory note" at § 9-102(65).

[18] DEL. CODE ANN. tit. 6, § 9-313(a); Cal. Com. Code § 9313(a).

presented a Certificate of the Delaware Secretary of State certifying that there are no effective

financing statements against Fund 3A.[19]  The Debtors also point out that the Plaintiffs admit in

the Complaint that they do not have possession of the original Collateral Assignment documents,

but, instead, allege that Fund 3A "acted as custodian of the records on behalf of the Plaintiffs."[20]

The Debtors assert that the Plaintiffs have not - - and could not - - allege facts to support a claim

that their interests in the Pledged Loan documents are perfected under Article 9 of the Uniform

Commercial Code.

The Plaintiffs also argue that, upon the Debtors' default, the Plaintiffs acquired the right

to enforce the notes and deed of trust against the Property pursuant to the language in the

Owlwood Loan Documents and the Collateral Assignment.[21]  The Debtors contend, however, that

---

[19] Adv. D.I. 17, Ex. A. DEL. CODE ANN. tit. 6, §§ 9-301(a), 9-307(e).

[20] Compl. ¶ 79.

[21] In particular, the Plaintiffs assert that the Loan Agreement states:

Woodbridge hereby grants to the Lender [Plaintiffs] a security interest in all of Woodbridge's present and future right, title and interest in and to any and all of the following (the "Collateral") . . .
> (c) The Mortgage or deed of trust securing the Pledged Loan with an interest in the Premises (the "Underlying Mortgage") . . . .

Additionally, the Plaintiffs point to the Form of Collateral Assignment attached to the Complaint, which states:
2. **Assignment**. As security for the performance of all obligations of Borrower [Fund 3A] to Lender [Plaintiffs] under the Note, the Assignment of Promissory Note and Mortgage, and all other documents now or hereafter evidencing, securing or related to the Loan (collectively, the "Loan Documents"), Borrower hereby assigns and transfers to Lender, on a non-exclusive basis, all of its right, title and interest in and to the following collateral (the "Collateral"):
> 2.1.1 All right, title, interest, claims or rights of Borrower now or hereafter in and to the notes, deeds to secure debt, security instruments, guaranties and other loan documents (collectively, the "Underlying Documents") described on Exhibit "A" attached hereto and incorporated herein by this reference;

. . . .

6. **Action by Lender Following Event of Default**. Lender shall have the right, but not an obligation, at any time while an Event of Default exists, without notice and without taking possession of the Property or any part thereof, to take in Lender's name or in the name of Borrower such action as Lender may, at any time or from time to time, reasonably determine to be necessary to cure any default under the Underlying Documents or to protect or exercise the

the Plaintiffs do not have a present right to enforce the Pledged Loan because Fund 3A did not transfer or "negotiate" the underlying promissory notes to the Plaintiffs.[22]

Article 3 of the Uniform Commercial Code, as enacted in both Delaware and California, governs the transfer of instruments.[23] The holder of the instrument is a person entitled to enforce the instrument.[24] A person becomes a "holder" through negotiation, which is accomplished by a transfer of possession and, in most cases, an indorsement by the holder.[25] Accordingly, the Debtors argue that, without possession, the Plaintiffs do not have any right to enforce the Pledged Loan documents under Article 3.

The Plaintiffs, however, argue that California law deems them in "possession" of the Pledged Loan documents pursuant to Cal. Bus. & Prof. Code § 10233.2, which provides:

> For the purposes of Division 3 (commencing with Section 3101) and Division 9 (commencing with Section 9101) of the Commercial Code, when a broker, acting within the meaning of subdivision (d) or (e) of Section 10131 or Section 10131.1, has arranged a loan or sold a promissory note or any interest therein, and thereafter undertakes to service the promissory note on behalf of the lender or purchaser in accordance with Section 10233, delivery, transfer, and perfection shall be deemed complete even if the broker retains possession of the note or collateral instruments

rights of Borrower or Lender thereunder, and may otherwise exercise any other rights or remedies Lender has under the Loan Documents . . . .

**7. Power of Attorney.** Borrower hereby irrevocably constitutes and appoints Lender as its true and lawful agent and attorney-in-fact, with full power of substitution, to demand, receive and enforce all rights of Borrower under the Underlying Documents, following the occurrence and during the continuance of an Event of Default . . . .
Complaint, Ex. 1 (C).

[22] *See Neilson v. Dwyer (In re Cedar Funding, Inc.)*, Bky. No. 08-52709, Adv. No. 09-5260, 2011 WL 4048526, *7 (Bankr. N.D. Cal. Sept. 12, 2011) ("While it is possible under the Commercial Code to convey or assign title to a note without a change of possession, absent delivery of possession, the assignment does not transfer the legal right to enforce it and collect its proceeds. In other words, title to a negotiable instrument is a distinct concept from the right to enforce the instrument.").

[23] DEL. CODE ANN. tit. 6, § 3-102(a); Cal. Com. Code § 3102(a) ("This division applies to negotiable instruments.").

[24] DEL. CODE ANN. tit. 6, § 3-301; Cal. Com. Code § 3301.

[25] "'Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." DEL. CODE ANN. tit. 6, § 3-201(a); Cal. Com. Code § 3201(a). "[N]egotiation requires transfer of possession of the instrument and its indorsement by the holder." DEL. CODE ANN. tit. 6, § 3-201(b); Cal. Com. Code § 3201(b).

and documents, provided that the deed of trust or an assignment of the deed of trust or collateral documents in favor of the lender or purchaser is recorded in the office of the county recorder in the county in which the security property is located, and the note is made payable to the lender or is endorsed or assigned to the purchaser.[26]

The Plaintiffs point out that all of the Plaintiffs (and other relevant lenders) with an interest in the Pledged Loan cannot simultaneously possess the underlying loan documents. The legislative history of the statute indicates:

> This bill is sponsored by the California Independent Mortgage Brokers Association (CIMBA) to specify that the technical requirements of the Commercial Code for perfection of a lender's real property security interest ... are deemed to have been completed under specified conditions where the real estate broker maintains physical possession of the note under a servicing contract in accordance with provisions of the Real Estate Law.
> ....
> The sponsor notes that there have been several recent situations of the bankruptcy of the servicing mortgage loan broker where the bankruptcy court has held that the lender's loan is unsecured, and the lender is an unsecured creditor of the broker, only because the current technical requirement of the Commercial Code for delivery of the note to the lender has not occurred. In these cases, the lender loses, although the position of the borrower and the bankrupt servicing mortgage loan broker is unchanged. **This bill was introduced to provide an exception to the technical delivery requirement in specified broker servicing situations that are in accordance with provisions of the real estate licensing laws.**[27]

The Debtors argue that California law does not apply here because (i) the loan documents specify that Delaware law applies, and (ii) UCC § 9-301 also specifies that the law of the jurisdiction where the debtor is located (in this case, Delaware) applies.[28] The Plaintiffs contend that

---

[26] Cal. Bus. & Prof. Code § 10233.2 (the "California 'Deemed Possession' Law").

[27] *Neilson v. Chang (In re First T.D. & Inv., Inc.)*, 253 F.3d 520, 530 (9th Cir. 2001) (quoting *Committee Report for 1991 California Senate Bill No. 1520,* Senate Committee on Bus. & Professions, 1991–92 Reg. Sess. 2 (Apr. 27, 1992) (emphasis added)).

[28] DEL. CODE ANN. tit. 6, § 9-301(1); Cal. Com. Code § 9301(1) ("[W]hile a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."). UCC § 9-307(e) provides that "[a] registered organization that is organized under the law of a state is located in that state." DEL. CODE ANN. tit. 6, § 9-307(e); Cal. Com. Code § 9307(e). Fund 3A is a limited liability corporation registered in the state of Delaware.

California law applies here because (i) it is a consumer protection law[29], and (ii) applicable choice-of-law rules.[30]

However, even assuming - - without deciding - - that the California "Deemed Possession" Law applies here, it does not aid the Plaintiffs in proving possession because the Plaintiffs have not alleged facts to support two necessary elements of the statute. The Debtors argue that the Plaintiffs have not - - and cannot - - allege that (i) Fund 3A is a licensed broker; and (ii) Fund 3A was servicing the promissory note in accordance with Cal. Bus. & Prof. Code § 10233.

The Plaintiffs dispute the Debtors' contention that the California Deemed Possession Law requires a licensed broker. First, they assert that the plain language of the statute requires that a broker is someone "*acting within the meaning of*" 10131(d) or (e), or 10131.1.[31] Second, the Plaintiffs contend that Cal. Bus. & Prof. Code § 10131.1 states that:

> A real estate broker within the meaning of this part **is also** a person who engages as a principal in the business of making loans or buying from, selling to, or exchanging with the public, real property sales contracts or promissory notes secured directly or collaterally by liens on real property, or who makes agreements with the public for the collection of payments or for the performance of services in connection with real property sales contracts or promissory notes secured directly or collaterally by liens on real property.[32]

---

[29] Section 9-201(b) of the UCC provides that "[a] transaction subject to this Article is subject to any applicable rule of law which establishes a different rule for consumers . . . ." DEL. CODE ANN. tit. 6, § 9-201(b). However, the Debtors argue that the California "Deemed Possession" Law is not a law that establishes a different rule for *consumers*. They claim that the law is a rule of general applicability and is not limited to transactions by individuals primarily for personal, family or household purposes. *See* DEL. CODE ANN. tit. 6, § 1-201(11) (defining "consumer"); *See also Tex. Lottery Comm'n v. First State Bank of Dequeen*, 325 S.W.3d 628, 636-37 (Tex. 2010) (deciding that the Lottery Act rule regarding prize assignments "is not specifically directed at or limited to individuals who enter into a transaction primarily for personal, family, or household purposes. Any purchaser of a lottery ticket, whether an individual or some type of entity such as a partnership, trust or corporation, purchases the ticket subject to the provisions of the Lottery Act . . . .").

[30] The Plaintiffs contend that the Debtors wrongly apply UCC § 9-301(1) to establish which state's law applies, and instead argue that California law applies pursuant to §9-301(3)(C), which specifically provides that "[w]hile tangible negotiable documents, good, instruments, money or tangible chattel paper is located in a jurisdiction, the local law of that jurisdiction governs: . . . (C) the effect of perfection and the priority of a nonpossessory security interest in the collateral."

[31] Cal. Bus. & Prof. Code § 10233.2 (emphasis added).

[32] Cal. Bus. & Prof. Code § 10131.1 (emphasis added).

The Plaintiffs argue that the statutory language recognizes that reference to "broker" in § 10233.2 includes people who *act* as brokers and does not specify a licensing requirement. The flaw in this argument is that this section of the California Business and Professional Code specifically defines a "broker" as "a person licensed as a broker under any of the provisions of this part"[33] and a "real estate broker" as "a person licensed as a broker under Chapter 3 of this part."[34] That Section 10233.2 only applies to licensed brokers was recognized by the Bankruptcy Court for the Northern District of California in *Cedar Funding*, in which the Court wrote:

> The court disagrees with the Chapter 11 Trustee's Business and Professions Code analysis for the simple reason that no evidence has been offered demonstrating that CFI was a licensed broker. Section 10233.2 only applies to "brokers," which Business and Professions Code § 10012 defines as a "licensed" broker.[35]

The legislative history also noted that the "bill was introduced to provide an exception to the technical delivery requirement in **specified broker servicing situations that are in accordance with provisions of the real estate licensing laws.**[36] I agree that § 10233.2 applies only when a licensed broker is in possession of the loan documents.

The Debtors also argue that the Plaintiffs do not - - and cannot - - allege that Fund 3A was servicing the Pledged Loan in accordance with Cal. Bus. & Prof. Code § 10233, which requires (among other things) a "written servicing agreement that satisfies the requirements of paragraphs (1), (2), (4) and (5) of subdivision (k) of Section 10238."[37]

---

[33] Cal. Bus. & Prof. Code § 10012, which states, in full: "'Broker' when used without modification, means a person licensed as a broker under any of the provisions of this part."

[34] Cal. Bus. & Prof. Code § 10015.

[35] *Cedar Funding*, 2011 WL 4048526 at *8.

[36] *Neilson v. Chang (In re First T.D. & Inv., Inc.)*, 253 F.3d 520, 530 (9th Cir. 2001) (quoting *Committee Report for 1991 California Senate Bill No. 1520*, Senate Committee on Bus. & Professions, 1991–92 Reg. Sess. 2 (Apr. 27, 1992) (emphasis added)).

[37] Cal. Bus. & Prof. Code §10233(a). Section 10238(k) includes further requirements for a "written agreement" between a licensed real estate broker and a purchaser or lender to "service the note or notes" and includes (among other things) specific requirements for depositing payments in a trust account

I agree with the Debtors that the Plaintiffs have failed to allege facts supporting their request for a declaratory judgment that the Plaintiffs hold perfected liens against the Owlwood Estate Property, or against any proceeds arising from a sale or liquidation of that Property. Counts I and II of the Complaint will be dismissed for failure to state a claim. The Plaintiffs' request for another opportunity to amend the Complaint also will be denied.[38]

2. Do the factual allegations support a claim that the Court should establish a constructive trust or an equitable lien against the Property or its proceeds in favor of the Plaintiffs?

Count III of the Complaint asks the Court to determine that, pursuant to the doctrines of constructive trust and equitable lien, the Plaintiffs have first-in-priority, valid secured interests in the Owlwood Estate Property or the proceeds derived from a sale or liquidation of the Property.[39] Whether a court should impose a constructive trust or equitable lien upon property is first determined by reference to state law.[40] The Plaintiffs argue that California law supports their claim.[41] The Debtors, however, argue that imposing a constructive trust or equitable lien against

---

[§ 10238(k)(1)(A)] or prohibiting commingling of funds [§ 10238(k)(1)(B)]. *See* 2018 Cal. Legis Serv. Ch. 285 (A.B. 2884) (West 2018).

[38] A court should "freely" grant leave to amend a pleading in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment, [or] futility of amendment." *In re Evergreen Energy, Inc.*, 546 B.R. 549, 565 (Bankr. D. Del. 2016) (quoting *PCT v. Authentic Specialty Foods, Inc. (In re Fleming Co., Inc.)*, 347 B.R. 163, 166 (Bankr. D. Del. 2006)). Here, the Debtors have shown that there was no UCC-1 filing and the Plaintiffs have alleged that Fund 3A had possession of the relevant Pledged Loan documents. It would be futile - - and prejudicial to the Debtors - - to allow further amendment to Counts I and II.

[39] Compl. ¶¶ 101-103.

[40] "Property interests are creatures of state law and 'the happenstance of bankruptcy' should not inform the way courts analyze them." *Tiare Int'l, Inc. v. United Fixtures Co., Inc. (In re Interlake Material Handling, Inc.)*, 441 B.R. 437, 441 (Bankr. D. Del. 2011) (quoting *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). Whether a constructive trust or equitable lien should be imposed is a question of state law. *Id.*

[41] Under California law, "[t]he imposition of a constructive trust requires: (1) the existence of res (property or some interest in property); (2) the right of the complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it." *In re Real Estate Assoc. Ltd P'ship Litig.*, 223 F. Supp. 2d 1109, 1140 (C.D. Cal. 2002) (citing *Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 990, 41 Cal. Rptr. 2d 618 (1995). "An equitable lien is a right to subject property not in the possession of the lienor to the payment of a debt as a charge against that

the Property would be futile, because any equitable interest would be avoided pursuant to the

strong-arm powers of Bankruptcy Code § 544(a)(3), which provides:

> **(a)** The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> . . . .
>
> > **(3)** a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.[42]

"Numerous courts and commentators have noted a tension between the text of §§ 541(a),

541(d) and 544(a).  These sections are not always easily reconciled because § 541(d) excludes

certain equitable interests from the estate[43] of a bankrupt while § 544(a) permits the trustee to

bring certain tainted property into the control of the estate"[44] for distribution to creditors.  The

Sixth Circuit noted that the Bankruptcy Code's policy of equitable distribution is paramount to

any policy that underpins the bankruptcy court's authority to impose an equitable trust, stating:

> Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the

---

property."  *Cty. Of Los Angeles v. Constr. Laborers Trust Fund for Southwestern Cal. Admin. Co.*, 137 Cal. App. 4th 410, 414, 39 Cal. Rptr. 3d. 917, 920 (Cal. Ct. App. 2006) (citing 42 Cal. Jur. 3d, Liens, §10 at 621)).  "It may arise from a contract which reveals an intent to charge particular property with a debt or 'out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealing.'"  *Id.*

[42] 11 U.S.C. § 544(a).  Pursuant to Bankruptcy Code § 1107, a debtor in possession will exercise all of the rights and powers, and will perform all of the functions and duties, of a trustee.  11 U.S.C. § 1107(a).

[43] Bankruptcy Code § 541(d) provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

[44] *Mullins v. Burtch (In re Paul J. Paradise & Assoc., Inc.)*, 249 B.R. 360, 366 (D. Del. 2000) (citations omitted).

offending debtor. "Ratable distribution among all creditors" justifies the Code's placement of the trustee in the position of a first-in-line judgment creditor and bona fide purchaser for value, empowered to avoid certain competing interests (and even to nullify the debtor's "preferential" prepetition payments to otherwise entitled creditors) so as to maximize the value of the estate. To a party defrauded by the debtor, incorporating the proceeds of fraud in the debtor's estate may seem like allowing the "estate to benefit from property that the debtor did not own." [*In re] Quality Holstein Leasing,* 752 F.2d [1009] at 1013 [5ᵗʰ Cir. 1985]. But as the Seventh Circuit has pointed out, "allowing the estate to 'benefit from property that the debtor did not own' is exactly what the strong-arm powers are about: they give the trustee the status of a bona fide purchaser for value, so that the estate contains interests to which the debtor lacked good title." *Belisle v. Plunkett,* 877 F.2d 512, 516 (7th Cir.1989) (criticizing *Quality Holstein Leasing*). The Code recognizes that each creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.[45]

Delaware courts, however, have not adopted a bright line rule that "the bankruptcy policy of ratable distribution trumps state law policy on constructive trusts."[46] Instead, Delaware courts have decided that a trustee may use the strong-arm powers of § 544(a)(3) to avoid an equitable interest in real property if the trustee can avoid that interest under applicable law of the state in which the property in question is located as of the bankruptcy petition's filing.[47]

---

[45] *XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.),* 16 F.3d 1443, 1452-53 (6th Cir. 1994) (footnotes omitted). "In the original Ponzi scheme case, *Cunningham v. Brown,* 25 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), the Supreme Court held that 'tracing' fictions should not be used to pursue individual recoveries when a fraud ensnares multiple victims whose funds are commingled. Instead, the Court held that all innocent victims should share equally in the recovered funds because equity demands equal treatment." *U.S. S.E.C. v. Infinity Grp. Co.,* 226 Fed. App'x 217, *218 (3d Cir. 2007). Non-bankruptcy courts have recognized that "*pro rata* distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions." *Id.* (citing *SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 89 (2d Cir. 2001) (explaining that 'the use of a *pro rata* distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme); *United States v. 13328 and 13324 State Highway North,* 89 F.3d 551, 553-54 (9th Cir. 1996) (collecting cases)).

[46] *Paul J. Paradise,* 249 B.R. at 370-71. *See also, e.g., Mortgage Lenders Network, USA, Inc. v. Wells Fargo Bank, N.A. (In re Mortgage Lenders Network, USA, Inc.),* 380 B.R. 131 (Bankr. D. Del. 2007) (deciding that the trustee could not use § 544(a) to avoid real property held by the debtor under an express trust); *In re Loewen Grp. Int'l, Inc.,* 292 B.R. 522, 527 (Bankr. D. Del. 2003) (deciding that the trustee could use § 544(a)(3) to avoid an unrecorded resulting trust interest under applicable Florida law).

[47] *Paul J. Paradise,* 249 B.R. at 371 ("'[A]lthough the trustee's strong-arm power arises under federal law, the scope of these . . . powers vis-à-vis third parties is governed entirely by the substantive

The Owlwood Estate Property is located in California. "In California, a purchaser for value of real estate without actual or constructive notice of a prior interest is given bona fide purchaser status."[48] "Section 544, however, must be applied 'without regard to any knowledge of the trustee or of any creditor.'"[49] The Ninth Circuit observed:

> While we agree that any constructive trust that is given effect must be a creature of [state] law, we cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust. . . . We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind bankruptcy laws.[50]

The Ninth Circuit determined that a trustee acting under Bankruptcy Code § 544(a)(3) could avoid equitable claims, such as a constructive trust, against real property.[51]

Similarly, here, even assuming - - without deciding - - that the Plaintiffs could establish a right under California law for imposition of a constructive trust or equitable lien against the Property, the Debtors could avoid any such equitable interest pursuant to the strong-arm powers of Bankruptcy Code § 544(a)(3). The Debtors' motion to dismiss Count III will be granted.

---

law of the state in which the property in question is located as of the bankruptcy petition's filing.' 'The incorporation of state law in this regard establishes that [w]herever under the applicable law such a creditor or bona fide purchaser might prevail over prior transfers, liens, encumbrances or the like, the trustee will also likely prevail.'") (quoting *Midlantic Nat'l Bank v. Bridge (In re Bridge)*, 18 F.3d 195, 200 (3d Cir. 1994)).

[48] *Chbat v. Tleel (In re Tleel)*, 876 F.2d 769, 772 (9th Cir. 1989) (citing Cal. Civ. Code §§ 1214, 1217). *See also Robertson v. Peters (In re Weisman)*, 5 F.3d 417, 420 (9th Cir. 1993) ("California is a race-notice jurisdiction and requires every conveyance of real property to be recorded in order to be valid against a subsequent purchaser of the same property.")

[49] *Tleel*, 876 F.2d at 772 (quoting 11 U.S.C. § 544(a)).

[50] *Tleel*, 876 F.2d at 771 (quoting *In re North American Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985), [op. amended by 774 F.2d 1930 (9th Cir. 1985)], *cert. denied sub nom. Torres v. Eastlick*, 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed. 2d 719 (1986)).

[51] *Tleel*, 876 F.2d at 773-74.

3. Do the factual allegations support a valid claim for elder abuse, including treble damages, under California law?

Count IV of the Complaint alleges that the Plaintiffs are the victims of financial abuse under California's Elder Abuse Act[52] and asks the Court to enter a judgment for treble damages and attorney's fees and costs.[53]  The Debtors contend that Count IV should be dismissed because it is an improper attempt to assert a prepetition claim through an adversary proceeding, rather than a proof of claim, after the claims bar date.  The Debtors also argue that the Plaintiffs do not have standing to assert such claims.

The Debtors note that on April 5, 2018, this Court entered an order establishing June 19, 2018, as the general bar date for the filing of proofs of claim against the Debtors.[54]  The Debtors served copies of its "Notice of Deadlines for Filing of Proofs of Claim and Proofs of Interest" upon each of the Plaintiffs and their counsel.[55]  The Bar Date Notice states that holders of claims who fail to file a timely proof of claim on or before the applicable bar date "may be forever barred, estopped, and enjoined from asserting such claim" against any of the Debtors.[56]  The Plaintiffs added the Elder Abuse Claim to the amended Complaint on July 17, 2018, which was four weeks after the deadline in the Bar Date Notice.

"In bankruptcy, 'the only appropriate way to assert a claim against a debtor's estate is through the timely filing of a properly executed proof of claim' and not through an adversary

---

[52] Cal. Welf. & Inst. Code § 15610.30.

[53] Cal. Welf. & Inst. Code § 15657.5; Cal. Civ. Code § 3345.

[54] Bky. Case D.I. 911

[55] Bky. Case D.I. 1599 (the "Bar Date Notice"); D.I. 1688 (affidavit of service regarding the Bar Date Notice).

[56] Bar Date Notice, ¶ 8.

proceeding."[57] Federal Rules of Bankruptcy Procedure 3001, 3002 and 3003 provide guidance on filing proofs of claim in a bankruptcy case.

The Debtors also argue that the Plaintiffs do not have standing to assert the Elder Abuse Claims. California law defines an "elder" as "any person residing in this state, 65 years of age or older."[58] The Debtors argue that the allegations in the Complaint fail to establish that any of the Plaintiffs meet the criteria of being (i) individuals, (ii) residents of the State of California, or (iii) 65 years of age or older when the alleged financial abuse occurred. Instead, the individual Plaintiffs are residents of Florida; the California residents are trusts or other entities (not individuals); and the Complaint alleges that the Plaintiffs were 65 years of age *as of the filing of the Complaint*. The Plaintiffs responded by arguing that the term "person" may include entities, and otherwise seek to amend the Complaint to clarify which Plaintiffs would meet the definition of "elder."

However, due to the procedural irregularities of the Elder Abuse Claim,[59] I will not address the standing issues in this adversary. The Debtors argue that the Elder Abuse Claims are untimely, but, in some cases, a court may allow a late-filed claim under Rule 9006(b) if the claimant can show that the tardiness was the result of excusable neglect.[60] For these reasons, Count IV will be dismissed but with leave to allow any Plaintiffs who believe they have valid

---

[57] *In re Ephedra Products Liability Litig.*, 329 B.R. 1, 7 (S.D.N.Y. 2005) (quoting *In re Johns–Manville Corp.*, 53 B.R. 346, 354 (Bankr.S.D.N.Y.1985)). *But, see, in re Dewey & LeBoeuf LLP*, 487 B.R. 169, 176 (Bankr. S.D.N.Y. 2013) (deciding that WARN Act claims may be brought by adversary complaint under Fed. R. Bankr. P. 7001(7) because they are equitable in nature; they seek to "recover back pay as equitable restitutionary relief as opposed to damages.")

[58] Cal. Welf. & Inst. Code § 15610.27.

[59] *See* Fed. R. Bankr. P. 7001, which has no basis for filing this claim.

[60] *Toscano v. The RSH Liquidating Trust (In re RS Legacy Corp.)*, 577 B.R. 134, 139 (Bankr. D. Del. 2017).

Elder Abuse Claims, and can show excusable neglect, to file motions seeking allowance to file late proofs of claim under Bankruptcy Rule 9006(b) or other applicable law.

Conclusion

For the reasons set forth above, Counts I, II and III will be dismissed with prejudice. Count IV also will be dismissed, but with leave to allow Plaintiffs to file motions in the main bankruptcy case seeking allowance to file late proofs of claims under Bankruptcy Rule 9006(b), or other applicable law, within 30 days.   An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  October 5, 2018